978 F.2d 717
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Frederick VON BODUNGEN; Mary A. Von Bodungen, aka Mary A.
Ward; Jean Ward De Velice; Los Amigos Inc., a Nevada
corporation and Von Bodungen Inc., a Nevada corporation,
Plaintiffs-counter-defendants-Appellants,
v.
The BANK OF AMERICA, National Trust and Savings Association,
Defendant-counter-claimant-Appellee.
 No. 90-16357.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 6, 1991.
Decided Oct. 28, 1992.
 
 Appeal from the United States District Court for the Northern District of California, No. CV-88-01869-WHO; Claudia Wilken, United States Magistrate, Presiding.
 N.D.Cal.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 1
 Before FLETCHER, WIGGINS and KOZINSKI, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Plaintiffs/appellants, Frederick and Mary Von Bodungen, appeal an order of the federal magistrate granting summary judgment in favor of the defendant/counter-claimant, the Bank of America.[1] The Von Bodungens argue that the magistrate erred in finding that the Bank of America had a statutory right of charge-back as well as equitable rights to setoff and to "money had and received." The Von Bodungens also argue that the magistrate erred in denying their motion for summary judgment on the issue of conversion. This court has jurisdiction over the appellants' timely appeal under 28 U.S.C. §§ 1291 and 636(c)(3). We reverse.
 
 I. Facts
 
 4
 In 1988, the Von Bodungens were investment intermediaries for, and five percent shareholders in, Global Mining, Ltd. In exchange for their five percent interest, the Von Bodungens were required to raise two million dollars. Kenneth Braid, another investor, agreed to raise one million dollars in return for an interest in the Von Bodungens' five percent of Global Mining. Braid was unable to produce the one million dollars immediately so the Von Bodungens loaned him $400,000. Prior to February 8, 1988, Braid had repaid the Von Bodungens $187,500 of the $400,000 loan. The repayment was received in the form of wire transfers. The money was to be applied to Braid's debt to the Von Bodungens and also to be applied toward the Von Bodungens' expenses on behalf of the Mine.
 
 
 5
 On February 8, 1988, Braid cashed a check made out to him in the amount of $100,000 at the Rancho Encinitas Branch of the Bank of America (Rancho Encinitas), where he had an account. The check was drawn on a Merrill Lynch Account of SDT International at Bank One in Columbus, Ohio. Although Braid had only $2,000 in his Bank of America account at the time, the Bank of America nevertheless cashed the check because Braid was a customer of long standing. Braid then had Rancho Encinitas issue a credit/entry letter[2] for $85,000 in the name of Mary Von Bodungen. The letter was wired to the South Lake Tahoe Branch of Bank of America (South Tahoe). Because there was no authorization to deposit the funds directly to the Von Bodungens' account, South Tahoe had to notify the Von Bodungens to collect the funds in person. When Mary Von Bodungen went to the bank to collect the funds, she was told that the funds were being transferred by wire, and that the credit/entry letter was the same as cash. She then deposited the wired funds in the Von Bodungens' account at South Tahoe. This exact same procedure (Braid cashing an SDT check and then transferring money to the Von Bodungens via credit/entry letter and the Von Bodungens collecting the funds and depositing them into their South Tahoe account) occurred on two other occasions.[3] On none of these occasions did Rancho Encinitas do anything to establish that the checks cashed by Braid were good or to protect itself in the event that they were not. The total amount of the credit/entry letters sent to the Von Bodungens was $320,000.
 
 
 6
 On each occasion, after depositing the funds in the Von Bodungen's account, Mary Von Bodungen used the proceeds to purchase cashier's checks. Ultimately, she purchased approximately $291,000 in cashier's checks, $190,000 of which were made out to Mary Ward (another name used by Mary Von Bodungen) (nine cashier's checks), $80,000 of which were made out to Mary Von Bodungen (three cashier's checks), and $21,955.78 of which were made out to Jones West Ford (one cashier's check). Of those made out to Mary Ward and Mary Von Bodungen, $100,000 worth were deposited in the Von Bodungens' account at the San Francisco Main Branch of the Bank of America (Main Branch).
 
 
 7
 Eleven days after the first SDT check was cashed, the Bank of America determined that the checks were not going to be honored. Upon discovering that the balance in Braid's account was insufficient to cover the checks, the Bank of America traced the funds through the credit/entry letters to the Von Bodungens. Some of the funds were still under the bank's control in the Von Bodungens' Main Branch account. Without notice, the Bank of America froze all of the Von Bodungens' accounts and stopped payment on those of the cashier's checks that had not yet been negotiated. Through these actions, the Bank of America seized $105,529.07 from the Von Bodungens' account and recouped $160,000 by placing a stop payment order on the cashier's checks.[4] The Von Bodungens, via demand letter to the Bank of America, requested the return of their funds and the payment of the cashier's checks. The Bank of America refused.
 
 
 8
 As a result of the Bank of America's actions, the Von Bodungens lost their five percent interest in Global Mining, Ltd. They sued the Bank of America, alleging conversion and other causes of action. The Bank of America counterclaimed and defended, claiming rights to statutory charge-back and equitable setoff. The magistrate denied the Von Bodungens' motion for summary judgment and granted the Bank of America's motion for summary judgment. The Von Bodungens appealed.
 
 II. Discussion
 
 9
 We conclude that the banking described above is comprised of three separate banking transactions. The first transaction involved Rancho Encinitas and Braid and included Rancho Encinitas' cashing of the SDT checks and converting them to credit/entry letters. The second transaction involved South Tahoe and the Von Bodungens and included South Tahoe's issuance of the credit/entry letters that the Von Bodungens then deposited. The third transaction involved the Von Bodungens and South Tahoe and included Mary Von Bodungen's purchase of cashier's checks with the funds in the Von Bodungens' South Tahoe account.
 
 
 10
 A. Payment Of The Credit Entry Letter Was Not A Provisional Settlement
 
 
 11
 The credit/entry letters involved in this case contained no conditional language. The letters on their face state that the funds transferred have been paid to the bank and that they are already on deposit. The letters are labelled "Proof of Deposit--Credit/Entry Letter (Use for Interunit Credits)." The deposition testimony of the Bank of America's Vice President of Operating Loss Prevention and Investigation was that the Bank of America used this instrument as a means of transferring money from one branch to another and that the bank treats credit/entry letters as final settlements. They are not checks drawn on another's account; it is the bank's own money that is transferred. The defendant admitted that credit/entry letters cannot be refused and that payment on them cannot be stopped. By the Bank of America's own admission, credit/entry letters are not conditional.
 
 
 12
 Because Braid was a customer of long standing, the Rancho Encinitas branch did not reuqire that he first deposit his SDT check and wait for it to clear. At Braid's request, the Rancho Encinitas branch issued the credit/entry letters transferring the Bank of America's own funds to the South Tahoe branch and deposited the balance of the SDT checks in Braid's account. The form of the credit/entry letters was not modified in any way to condition their validity on the final settlement of the SDT checks. We conclude that there was nothing provisional about this end of these transactions.
 
 
 13
 When the South Tahoe branch accepted the credit/entry letters for payment to the Von Bodungens, the credit/entry letters became a final settlement. The South Tahoe branch advised the Von Bodungens when the credit/entry letters arrived for them. The Von Bodungens personally had to accept the payment before South Tahoe could deposit the money into their account. The South Tahoe branch told Mary Von Bodungen that the credit/entry letters were as good as cash. The Von Bodungens could have accepted the letter and then walked out of the bank with dollar bills in a gunny sack had they so chosen. We conclude that there was nothing provisional about this end of these transactions.
 
 
 14
 Accordingly, we hold that the credit/entry letters were a final unconditional settlement with the Von Bodungens and not a provisional settlement. Consequently, the Bank of America acted wrongfully in seizing the Von Bodungens' accounts and stopping payment on the cashier's checks.
 
 B. Statutory Charge-Back Was Not Warranted
 
 15
 The Bank of America claims that it is entitled to statutory charge-back against the accounts of the Von Bodungens under California Commercial Code sections 4212 and 4213. Section 4212 allows a bank that makes a provisional settlement with a customer to charge-back the amount of any settlement for which it does not receive final payment.
 
 
 16
 If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for an item ... the bank may revoke the settlement given by it, charge back the amount of any credit given to the customer's account or obtain refund from its customer....
 
 
 17
 Cal.Com.Code § 4212 (West 1991). One example of a provisional settlement is acceptance of a deposit and credit to the depositor's account of another's personal check. The settlement does not become final until the check has cleared. Because we conclude that the transfer of funds to the South Tahoe branch using credit/entry letters does not parallel this example, the issuance of the credit/entry letters was not a provisional settlement, and section 4212 does not apply.
 
 
 18
 The Bank of America claims that there was never a final settlement of any of the credit/entry letters because the SDT checks never cleared. The Bank of America's position rests entirely on its contention that credit/entry letters are items that provisionally can be settled or even revoked. We hold, however, that the credit/entry letters were not provisional and could not be revoked. We conclude that the payment of the credit/entry letters to the Von Bodungens was a final settlement. Thus, the Bank of America is not entitled to statutory charge-back, and the magistrate erred by not granting summary judgment in favor of the Von Bodungens on this issue.
 
 C. Equitable Setoff Was Not Warranted
 
 19
 California law recognizes an equitable right of banks to apply deposited funds as a setoff. Kruger v. Wells Fargo Bank, 11 Cal.3d 352, 521 P.2d 441, 113 Cal.Rptr. 449 (1974); Gonsalves v. Bank of America, 16 Cal.2d 169, 105 P.2d 118 (1940). This right may be exercised only in response to and to the extent of a matured debt owed by the depositor to the bank. Id. Because the acceptance of the credit/entry letters was a final and not a provisional settlement, the Von Bodungens owed no matured debt to the Bank of America. Equitable setoff is unavailable.
 
 
 20
 The Bank of America also claims that it is entitled to setoff based on the doctrine of restitution and unjust enrichment. It argues that it is entitled to recover money paid based on a mistake of fact so long as the beneficiary has not changed position. Nat'l Bank of California v. Miner, 167 Cal. 532, 140 P. 27 (1914). However, it is not, as the Bank of America claims, "uncontroverted that the bank's transfers and payment of funds to the Von Bodungens were entirely due to a mistake of fact." That claim is based on the Bank of America's view that the issuance of the credit/entry letters was only a provisional settlement. The Bank of America argues that South Tahoe disbursed the funds based on the mistake of fact that the Rancho Encinitas credit/entry letters were good. They were good. They were drawn on the Bank of America's own account. They indicated on their face that payment for the letters had been received. South Tahoe did not make a mistake of fact in honoring the letters. The only "mistake" in this case was Rancho Encinitas' decision to honor Braid's SDT checks before they cleared. However, that transaction is completely separate and not at issue in this case. That "mistake" does not effect the payment of the credit/entry letters. Thus, the Bank of America is not entitled to equitable setoff, and the magistrate erred by not granting summary judgment in favor of the Von Bodungens on this issue.
 
 
 21
 D. Judgment For Money Had And Received Was Not Warranted
 
 
 22
 An action for money had and received is based on the same equitable doctrines as equitable setoff. But where setoff allows the bank to seize a depositor's funds in its possession, money had and received allows the bank to obtain a judgment for money mistakenly paid out that is no longer under the bank's control.[5] In order to obtain a judgment, the Bank of America must prove that the funds were paid out as a result of a mistake of fact and that the beneficiary has not changed position. County of Santa Cruz v. McLeod, 189 Cal.App.2d 222, 228, 11 Cal.Rptr. 249, 253 (1961).
 
 
 23
 As discussed in Part IIC, the South Tahoe branch did not pay the credit/entry letters based on a mistake of fact. The credit/entry letters represented a transfer of funds on the bank's account that could not be refused. Thus, the Bank of America cannot sustain its action for money had and received, and the magistrate erred in not granting summary judgment in favor of the Von Bodungens on this issue.
 
 
 24
 E. Partial Summary Judgment For Von Bodungens Was Warranted On Conversion Cause of Action
 
 
 25
 The Von Bodungens allege conversion based on two different actions by the Bank of America. First, they claim that the seizure of the $105,529.07 from their account at Main Branch was a conversion. Second, they claim that the Bank of America's stop payment on those of the cashier's checks that had not yet been negotiated, which totalled $160,000, was a conversion.
 
 
 26
 With respect to the seizure of the Von Bodungens' account at Main Branch, the magistrate acted properly in granting summary judgment in favor of the Bank of America. It is well settled that a bank may not be sued for conversion of funds that are on deposit with the bank. The bank is considered to be the owner of funds that are deposited with it. Thus, it cannot be found tortiously to have converted those funds. Crocker-Citizens National Bank v. Control Metals, 566 F.2d 631, 637 (9th Cir.1977); Morse v. Crocker National Bank, 142 Cal.App.3d 228, 232, 190 Cal.Rptr. 839, 842 (1983).
 
 
 27
 With respect to the $160,000 worth of cashier's checks, the magistrate erred by granting summary judgment in favor of the Bank of America and not in favor of the Von Bodungens. There are three elements to a cause of action for conversion: the plaintiff must own or have a right of possession to the property alleged to have been converted; the defendant must interfere with the exercise of plaintiff's property rights in such a manner so as to amount to a taking of the property; and, the plaintiff must suffer damages as a result of defendant's actions. Moore v. Regents of University of California, 202 Cal.App.3d 1230, 1243, 249 Cal.Rptr. 494, 503 (1988); Baldwin v. Marina City Properties, Inc., 79 Cal.App.3d 393, 410, 145 Cal.Rptr. 406, 416 (1978).
 
 
 28
 The Bank of America claims that the Von Bodungens are unable to satisfy the necessary three elements. With respect to the first element--the requirement of ownership or right of possession--the Bank of America first claims that the Von Bodungens did not own the money transferred by the credit/entry letter because the money had been obtained by Braid from individual investors and was to have been invested on those investors' behalf in Global Mining. However, examination of the business deal underlying the banking transactions reveals that the funds in question were simultaneously investor money and a repayment of Braid's preexisting debt to the Von Bodungens. The Bank of America's first claim fails.
 
 
 29
 The Bank of America second claims that even if the Von Bodungens would have been entitled to the funds as owners or agents had the SDT checks cleared, they could not meet this element where they obtained funds to which they were not entitled due to the refusal of the SDT checks. This argument rests on the Bank of America's contention that the disbursement of the credit/entry letters was only a provisional settlement. But, as we earlier concluded, the payment of the credit/entry letters was not a provisional settlement. Consequently, the Von Bodungens were the rightful owners of the funds when the Bank of America stopped payment on the cashier's checks. The Bank of America's second claim fails.
 
 
 30
 The Bank of America third claims that the Von Bodungens were not holders in due course and therefore are not entitled to maintain the action. The Bank of America argues that the Von Bodungens did not pay value for the cashier's checks because they purchased them with funds that they should not have received. This argument is also premised on the Bank of America's contention that payment of the credit/entry letters was only a provisional settlement. But, as we earlier concluded, the payment of the credit/entry letters was a final settlement. Consequently, the Von Bodungens were the rightful owners or possessors of the funds used to purchase the cashier's checks. The Bank of America's third claim fails.
 
 
 31
 The remaining two elements are easily satisfied. The Bank of America's order stopping payment on the cashier's checks so interfered with the Von Bodungens' interest in the checks as to amount to a taking. The Bank of America's order resulted in over $160,000 being taken away from the Von Bodungens. The order caused the Von Bodungens serious financial damages including the loss of their five percent interest in Global Mining for failure to make their loan payments. Therefore, the Von Bodungens were entitled to judgment as a matter of law on the cause of action for conversion of the cashier's checks.
 
 
 32
 Finally, the Von Bodungens may recover for conversion only of those checks made out to Mary Von Bodungen or Mary Ward. According to the record, the Bank of America stopped payment only on those cashier's checks initially purchased by Mary Von Bodungen that had not yet been negotiated. Of the cashier's checks initially purchased by Mary Von Bodungen, only one--the one made out to Jones West Ford--was not made out either to Mary Von Bodungen or Mary Ward. On remand, the magistrate should determine if the cashier's check made out to Jones West Ford was one on which payment was stopped. If so, the Von Bodungen's may not recover for conversion of that cashier's check.
 
 III. Conclusion
 
 33
 The payment of the credit/entry letters was a final settlement. The payment rightfully belonged to the Von Bodungens and was not paid under a mistake of fact. The only mistake that occurred in this case was the Rancho Encinitas branch's poor business decision in issuing the credit/entry letters without first receiving payment from Braid for them. The Bank of America may not escape its own error by tracing the funds through several separate transactions and asserting that the whole series of transactions were tainted. Thus, the magistrate erred by not granting summary judgment in favor of the Von Bodungens on the Bank of America's actions for statutory charge-back, equitable setoff, and money had and received, and the Von Bodungens' action for conversion of the cashier's checks.
 
 
 34
 Therefore, the judgment of the magistrate is hereby AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this disposition. Each party shall bear its own costs on appeal.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 This case was conducted before Magistrate Wilken pursuant to 28 U.S.C. § 636(c)(1). Both parties waived their right to proceed before a United States District Judge and further consented and stipulated that any appeal would be directly to the court of appeals
 
 
 [2]
 A credit/entry letter is a document issued by the Bank of America reflecting that funds have been deposited in the Bank of America's account and ordering the receiving bank to pay the amount to the named beneficiary of the letter. A credit/entry letter is analogous to a wire transfer. The proper legal characterization and effect of a credit/entry letter is discussed in section IIA, below
 
 
 [3]
 On the second occasion, Braid cashed an $80,000 SDT check, all of which he had transferred to Mary Von Bodungen via credit/entry letter and all of which she used to purchase cashier's checks. On the third occasion, Braid cashed a $160,000 SDT check, $150,000 of which he had transferred to Mary Von Bodungen via credit/entry letter and $140,000 of which she used to purchase cashier's checks
 
 
 [4]
 The bank was unable to recover approximately $53,000 of the original $320,000 transferred by the credit/entry letters
 
 
 [5]
 Money had and received is a common count adaptable to varied transactions. Here, we are considering the requirements of the common count to money paid under a mistake of fact